# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CRYSTAL D. WARREN,                )
                                                      )
                        Plaintiff,            )        No. 15 C 8987
                                                      )
            v.                                       )        Judge Thomas M. Durkin
                                                      )
CAROLYN COLVIN, Acting          )
Commissioner of Social Security,  )
                                                      )
                        Defendant.          )


## MEMORANDUM OPINION AND ORDER

Plaintiff Crystal D. Warren appeals from the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. For the reasons that follow, the Commissioner's decision is vacated and the case is remanded for further proceedings.

### BACKGROUND

Warren filed an application for disability benefits on August 17, 2011, alleging that, as a result of her illnesses, she has been unable to work since March 14, 2011. (AR 121).[1] Warren later amended the date of the onset of her disability to April 1, 2012. (AR 211). Warren's application was denied initially on March 9, 2012, (AR 124), and upon reconsideration on July 2, 2012, (AR 128, 131). On July 18, 2012, Warren filed a request for a hearing before an Administrative Law Judge

---

[1] Citations to "AR" are to the Administrative Record, R. 11.

("ALJ"). The hearing took place on February 18, 2014 (AR 51-117), and the ALJ issued a written decision denying Warren's application on May 30, 2014 (AR 20-44). The ALJ's findings on steps 1, 2 and 3 of the five-part sequential evaluation process used to determine whether a claimant seeking Social Security disability benefits is disabled,[2] are not in dispute. Instead, Warren's appeal focuses on the ALJ's determination on step 4, that she has the residual functional capacity ("RFC") to perform her past relevant work as a mailroom attendant, and, on step 5, that she also can perform other "light work" jobs[3] in the national economy such as hand packager, cleaner, and laundry sorter. Warren filed a request for review of the ALJ's decision with the Social Security Administration Appeals Council on August 1, 2014. (AR 15). The Appeals Council denied her request on August 26, 2015. (AR 1). Warren then filed the present action. R. 1. This Court has jurisdiction to review the Commissioner's final decision denying Warren's application for disability benefits pursuant to 42 U.S.C. § 405(g).

---

[2] "To determine disability, the ALJ makes a five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520).

[3] *See* 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.").

## STANDARD OF REVIEW

Judicial review of a final decision of the Social Security Administration is generally deferential. The Social Security Act requires the reviewing court to sustain the ALJ's findings if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court should review the entire administrative record, but must "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the [ALJ]." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "However, this does not mean that [the court] will simply rubber-stamp the [ALJ's] decision without a critical review of the evidence." *Id.* A decision may be reversed if the ALJ's findings "are not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Id.* In addition, the court will reverse if the ALJ does not "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005). In addition, the ALJ "has a duty to fully develop the record before drawing any conclusions," *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007), and deference in review is lessened when the ALJ has made errors of fact or logic, *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). When the ALJ has satisfied these requirements, the responsibility for deciding whether the claimant is disabled falls on the Social Security Administration, and, if conflicting evidence would allow reasonable minds

to differ as to whether a claimant is disabled the ALJ's decision must be affirmed. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (internal quotation marks and citation omitted).

## DISCUSSION

The ALJ found that Warren suffered from several severe impairments, including systemic lupus erythematous ("SLE"), depression, anxiety, and alcohol abuse. (AR 22). SLE is an autoimmune disease where the body's immune system mistakenly attacks healthy tissue. *See https://medlineplus.gov/ency/article/000 435.htm* (last visited on 1/3/2017). It can affect the skin, joints, kidneys, brain, and other organs, with symptoms varying from person to person depending on which body parts are most affected in that person. *Id.* Almost everyone with SLE, however, has joint pain and swelling in the fingers, hands, wrists, and knees. *Id.* In addition to her joints, Warren's SLE symptoms in the past have primarily affected her skin, a condition known as discoid lupus. *See http://www.aocd. org/?page=DiscoidLupusErythe* (last visited on 1/3/2017). A person with discoid lupus can experience chronic skin sores, inflammation, and scarring on the face, ears, scalp and other parts of the body. *Id.*

According to her medical records, Warren is being treated by a team of doctors at Northwestern Medical Facility. Her primary care provider is Dr. Tang, and her treating rheumatologist is Dr. Hsieh. Warren also has received treatment from a psychiatrist (Dr. Dinwiddie), an ophthalmologist (Dr. Schmidt), a dermatologist (Dr. Laumann), and another internist (Dr. Dolan). To control her

lupus symptoms, Warren has been prescribed a medication called hydroxychloroquine, also known as Plaquenil. (AR 342). The possible side effects of Plaquenil include headaches, dizziness, nausea, and vision problems. *See https://www.nlm.nih. gov/medlineplus/druginfo/meds/a601240.html* (last visited on 1/3/2017). In addition to taking Plaquenil to control her lupus symptoms, Warren is taking medications for pain (methotrexate, prednisone, and ibuprofen), for skin irritations, lesions, and hair loss (clindamycin lotion and clobetasol propionate), for chronic coughing (albuterol inhaler), and for depression (Paxil). (AR 342).

Warren reports that her symptoms from lupus include constant pain, swelling, weakness, numbness, and tingling in her hands, legs, ankles, and/or back. (AR 253). She also reports "severe throbbing pain" in her left eye, blurred vision, lesions on her scalp that ache at times, shortness of breath with physical activity, and "burning pain in [her] back after sitting for longer periods of time." (*Id.*). She states that she (1) has "difficulty getting up from a seated position due to muscle spasms in [her] back," (2) "cannot lift and carry objects that weigh more tha[n] a gallon of milk," (3) "experience[s] lightheadedness and dizziness," and (4) is "sensitive to the light, sit[s] in the dark a lot," and has "to avoid being in the sun due to doctor[']s orders." (*Id.*). She also reports that she has feelings of "hopelessness and helplessness," "nervousness and frustration," and "self-hate, guilt and worthlessness," and that she is "easily angered," "lack[s] motivation to do most things," has "mood swings" and "crying spells a few times per day," "has difficulty concentrating," and "lacks energy and is fatigued most of the time." (*Id.*). She states

that she avoids being around others, does not talk on the phone, isolates herself at home, and needs to be reminded to care for her personal needs such as showering and combing her hair. (*Id.*).

Warren repeated these symptoms at the administrative hearing, where she testified that the pain she experiences has increased significantly since she was first diagnosed with lupus, that her back hurts, her hands hurt, and her head throbs daily (AR 76), that she had a pain shooting down to her kneecap and around to her abdomen as she was testifying right then (AR 82), that four days out of the week the pain is "excruciating (*id.*), that she does not sleep well because of the pain (AR 83), that she stopped driving because her leg no longer functions comfortably (*id.*), and that she frequently does not wear underwear at home because the pain in her fingers prevents her from putting them on (*id.*). She wears splints on her hands "24/7" to help with the wrist pain, but neither the splints nor ibuprofen help with the pain in her fingers (AR 83-84). She gets headaches at least three to four times during the week, which she experiences as a throbbing pain over her left eye (AR 85-86), and she sees a psychiatrist to talk about her depression from having lupus and how it changed her life and forced her to take all kinds of medicine that make her feel sick (AR 86-87). She reports that she has tried a number of antidepressants, but experiences negative side effects from them (AR 87-88), and that she has not been able to obtain continuous psychiatric treatment because her insurance does not cover it and she cannot always afford to pay for the appointments (AR 88). She testified that, although she had tried in early 2012 to return to work on a part-time

basis, she was fired in May 2012 because her employer could no longer accommodate her part-time work schedule. (AR 71-72). She estimated she could lift four pounds, stand about fifteen minutes at a time, walk about a half block, and sit twenty to thirty minutes continuously without exacerbating her pain. (AR 103-105).

A person is disabled under the Social Security Act if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Warren's description of her symptoms makes a compelling case that she is disabled from gainful employment, which "normally requires an ability to work a 40–hour week without missing work more than twice a month." *Allensworth v. Colvin*, 814 F.3d 831, 833 (7th Cir. 2016). The ALJ, however, rejected both Warren's testimony concerning the nature and extent of her impairments and the medical opinion evidence that supported a finding that she was disabled. After a thorough review of the record, the Court concludes that the reasons given by the ALJ for her rejection of this evidence are either legally insufficient or not supported by substantial evidence, thus requiring a remand for reconsideration of Warren's disability application in accord with the principles discussed below.

### A.   THE ALJ'S REJECTION OF THE OPINION OF WARREN'S TREATING PRIMARY CARE PHYSICIAN

The ALJ rejected the opinion of Warren's treating primary care physician, Dr. Tang, who stated in a letter dated April 30, 2012 that, "[b]ecause of [Warren's]

multiple medical conditions," she "recommended that it not be in [Warren's] best interest to work full-time." (AR 709). Dr. Tang further stated that, "[d]ue to the uncertain course of [Warren's] medical condition and the necessary ongoing changes in medication management, [she is] unable to supply a concrete date for [Warren's] return to work on a full-time basis." (*Id.*). "[T]o the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (citation omitted). But the ALJ accorded Dr. Tang's opinion only "slight weight" because (1) it was "conclusory"; (2) it did "not contain any functional capacity assessment"; (3) it was "not consistent with or supported by Dr. Tang's contemporaneous progress and examination notes, or with the objective imaging studies and laboratory reports"; and (4) it "seem[ed] to be affected by her sympathy for the claimant, and claimant's reported need for frequent visits to manage her treatment and medication." (AR 38) None of these reasons justify the ALJ's rejection of Dr. Tang's opinion.

To begin with, the asserted conclusory nature of Dr. Tang's opinion is not an adequate basis to reject it. To be sure, the ALJ was not bound by Dr. Tang's conclusion in her letter that Warren should not work full-time. *See Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013) (the ALJ "was not bound" by the claimant's doctor's statement in a letter that the claimant "'will be unable to return to any form of employment,' because a doctor may not be acquainted with the full range of jobs that a person with [the claimant's] ailments could fill"). Nevertheless, it

appears from Dr. Tang's letter and Warren's medical records that Warren's ability to work full-time was severely diminished by the overall impact of her many symptoms, by the side-effects of her various medications taken for those symptoms, by the uncertainties caused by sudden onset and fluxuating symptoms, and by the practical and emotional difficulties she understandably was having managing all of those things. The impact of these things on Warren's RFC are matters "to which medical testimony is relevant and if presented can't be ignored." *Id.* (citing *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012), and *Ferguson v. Commissioner of Social Security*, 628 F.3d 269, 272-73 (6th Cir. 2010)). If the ALJ thought that it was possible there were jobs in the economy that Warren could perform despite her lupus diagnosis and the difficulties that diagnosis presented for her, as alluded to in Dr. Tang's letter, she "should have asked [Dr. Tang] to specify more exactly what 'functions' [Warren] is incapable of performing," *Garcia*, 741 F.3d at 760, before rejecting Dr. Tang's opinion as conclusory and according it only slight weight for that reason.[4]

---

[4] *See, e.g., Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (ALJ must consider medical opinions regarding claimant's ability to work and "should recontact the doctor for clarification if necessary) (citing 20 C.F.R. § 404.1527(c)(3), S.S.R. 96–2p at 4, and *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.")); *see also Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000) (criticizing the ALJ for discounting the functional limitations set forth by treating physician and stating that, if the ALJ was concerned that the medical evidence was insufficient to support those limitations, he should have ordered more recent medical records).

Similarly, the ALJ should not have discounted Dr. Tang's opinion based on the absence of a functional capacity assessment. Presumably, the ALJ was referring to Warren's physical functional capacity when she mentioned Dr. Tang's failure to provide such an assessment. Again, the ALJ should have asked Dr. Tang to clarify her physical functional capacity assessment of Warren if the ALJ desired more information about that before deciding what weight to give Dr. Tang's opinion. Moreover, a claimant's RFC can be affected by both exertional impairments and non-exertional impairments. "Exertional impairments are those that affect the claimant's 'ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling),'" while "[n]onexertional impairments—such as depression, anxiety, difficulty concentrating or remembering—are defined as all other impairments that do not affect a claimant's ability to meet the strength demands of jobs." *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005) (quoting 20 C.F.R. § 404.1569a(b) and 20 C.F.R. § 404.1569a(c)(1)). Dr. Tang's opinion appears to reflect primarily non-exertional impairments related to the uncertainties and difficulties in managing a medical diagnosis of lupus, and her opinion regarding these non-exertional matters is not rendered irrelevant simply because she does not also state an opinion regarding the extent to which Warren's RFC is affected by exertional impairments caused by her illness. The ALJ had a duty to consider both exertional and non-exertional impairments in deciding whether Warren was disabled.

Third, the ALJ failed to provide an explanation of the ways in which Dr. Tang's opinion was inconsistent with or not supported by her contemporaneous progress and examination notes or the objective imaging studies and laboratory reports. While the Court could speculate about what the ALJ had in mind based on the ALJ's description of the medical records in another part of her decision, it would not be appropriate to do so. Instead, the ALJ "must build an accurate and logical bridge from the evidence to [her] conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014), and the ALJ did not make any attempt to do that here.

Finally, the ALJ's speculation that Dr. Tang's opinion might have been affected by her sympathy for Warren is not supported by substantial evidence in the record. While the Seventh Circuit has said that the ALJ has the ability as a trier of fact to consider a treating physician's possible sympathy bias, *see, e.g., Reynolds v. Bowen,* 844 F.2d 451 (7th Cir.1988*); Stephens v. Heckler,* 766 F.2d 284 (7th Cir. 1985*)*, it also has stated that:

> *Reynolds* and *Stephens* do not create a presumption of bias in a treating physician's disability opinion; the cases recognize only the ALJ's ability as a trier of fact to consider a physician's possible bias. The ability to consider bias, however, is not synonymous with the ability to blithely reject a treating physician's opinion or to discount that physician's opportunity to have observed the claimant over a long period of time. *Reynolds* and *Stephens*, moreover, do not change the requirement that the ALJ's findings be supported by substantial evidence; a requirement we believe the ALJ has failed to meet in this case.

*Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir. 1992). The possibility of bias is not supported by the record here because, like *Micus*, "[t]his case does not involve

[dueling] experts," with one opinion from a consulting expert "with a thorough knowledge of a disease versus a [second opinion by a treating physician, who is a] perhaps parochial and biased general practitioner." *Id.* In fact, the only consulting expert opinions in the record were rejected by the ALJ. The state examining expert opined that, as of February 17, 2012 (the date of his physical examination of Warren), Warren could perform "the full range of work at the medium exertional level." (AR 39). This opinion apparently was based on the consulting physician's findings that Warren's "gait was normal and without any assistive devices," that she "had normal grip strength bilaterally," that she "was able to grasp, finger, and manipulate with each hand bilaterally," that "[m]otor strengt[ ]h was 5/5 throughout," and that her "[s]ensation a[n]d deep tendon reflexes were within normal limits." (AR 440). On June 27 and 29, 2012, two other state consulting experts reviewed the file and affirmed the opinion of the state examining physician after consideration of additional medical records showing Warren's treatment for depression with Dr. Dinwiddie in March 2012. (AR 455). The ALJ rejected all of these consulting opinions after concluding that "the record as a whole, including evidence added after the State Agency reviews, shows that the claimant is more limited than [the state consulting physicians] opined." (AR 39).[5]

---

[5] Despite rejecting the consulting physicians' RFC opinions that Warren could perform medium work, the ALJ stated that she accorded those physicians' reports "some weight." (AR 39). The ALJ, however, did not explain the logic of according those opinions "some weight" when the ALJ acknowledged that the only consulting physician who examined Warren did so on February 17, 2012 (AR 440), and that evidence in the record regarding Warren's physical limitations from after that date rebutted the physical findings from that examination.

The only explanation (if it can be called that) given by the ALJ for suspecting that Dr. Tang's opinion was influenced by sympathy for Warren was Warren's "reported need for frequent visits to manage her treatment and medication." (AR 38). It is not clear whether the ALJ meant that Dr. Tang was the one who reported the need for frequent doctor's visits or whether that was a need reported by Warren for which Dr. Tang had sympathy. If Dr. Tang was the one who reported the need in question, then her report was a medical opinion that the ALJ could not simply ignore. Instead, she was required to state her reasons for rejecting either the accuracy of that need or else Dr. Tang's medical conclusion that the need imposed relevant non-exertional restrictions on Warren's RFC. The ALJ did neither.

If the ALJ questioned whether Warren even had a need for frequent medical attention, she failed to cite any evidence in the record for doing so, such as evidence showing that the number and variety of doctor's visits shown in the record were unwarranted by Warren's medical symptoms. In fact, the ALJ appears to be critical of Warren in other parts of her decision based on Warren's failure to make or keep follow-up appointments with certain physicians.[6] It appears that the most accurate interpretation of the ALJ's statement regarding Warren's "reported need for

---

[6] It is not clear whether the ALJ thought this failure reflected on Warren's credibility concerning the severity of her symptoms (as in, if her symptoms were as severe as she said they were, then she would have gone to the doctor more frequently), or whether the ALJ believed this failure was the cause of some of Warren's symptoms (as in, her symptoms would not have been as bad as they were if she had sought appropriate treatment more frequently). In either case, however, it would be neither logical nor fair to criticize Warren in one part of the decision for having too many doctor's appointments, while at the same time criticizing Warren in another part of the decision for not having more doctor's appointments.

frequent visits to manage her treatment and medication" is that the ALJ thought Warren was capable of managing her medical treatment more effectively and in such a way that it would not affect her ability to work full-time. The ALJ's reasoning appears to be based on the cryptic comment that Warren's frequent doctor visits were "not well supported by the record, which shows that the claimant's non-compliance with Plaquenil was not related to her work, but rather her own choice." (AR 38). Without further explanation, the Court cannot say for certain what the ALJ meant by this statement. It appears, however, that the ALJ was referring to evidence in the record that Warren has not always taken her lupus medication, Plaquenil, regularly. *See* AR 38 (citing to a psychiatric medical note dated February 12, 2014 (AR 873), which states among other things that Warren "[a]dmitted to her long denial of her SLE, [and] previous nonadherence to its treatment").

There are numerous reasons why it was inappropriate for the ALJ to rely on Warren's admitted failure to always have taken Plaquenil regularly as prescribed by her doctors as the ALJ's reason for rejecting Dr. Tang's opinion that Warren could not work full-time while managing her medical treatment. First and foremost, the reason Warren most often gave for failing to take the Plaquenil regularly was that the side effects interfered with her ability to work.[7] Thus, there is not

---

[7] *See, e.g.,* AR 78-80 (admitting to difficulty accepting her lupus diagnosis and initially avoiding some of her treatment regimen because her medications made her sick and nauseous while she was at work); *see also* AR 516 ("Pt was officially laid off at work . . . [and] feels relieved about the whole scenario because she feels it was too stressful to try to take care of her health while working. She admits she was unable

substantial evidence in the record to support the ALJ's conclusion that Warren's "non-compliance with Plaquenil was *not* related to her work, but rather her own choice." AR 38 (emphasis added).[8]

In addition to the side effects of Plaquenil affecting her ability to work, there simply is no indication in the vast majority of the medical notes in the record that, had Warren taken her lupus medication more regularly, she would not have needed as many doctor's visits as she did. The primary medical basis for the ALJ's apparent conclusion to the contrary are one or two comments in the medical notes by Warren's ophthalmologist stating that Warren's eye pain might be more controlled if she were more regular about taking the Plaquenil. Aside from the fact that it is unclear to what degree those notes are based on medical fact versus speculation by Warren's treating ophthalmologist, the comments in question are from a period prior to the amended onset date for Warren's disability. Further, they relate only to the issue of Warren's recurring eye pain, and do not support the conclusion that Warren would not have needed all of the other medical treatment shown by her

_____

to take her medications reliably while working and was always worried about side-effects (such as needing to run to the bathroom) which would prevent her from doing her job while at work. Her medications for depression has also made her extremely fatigued and sleepy."); AR 793 ("many of her medications make her nauseous").

[8] There is one relatively isolated instance in the record in which it might be said that it was Warren's "choice," as opposed to her need to not be sick at work, that caused her to not take her medicine. That instance was when Warren admitted to not taking the Plaquenil for a three week period because she was undergoing a fast for religious reasons and stopped taking virtually all of her medications due to concern about taking them on an empty stomach. (AR 526).

medical records from doctors other than her ophthalmologist.[9] As will be discussed later in this opinion, there also is some indication in Dr. Hsieh's medical notes from the latter part of 2013 that she believed Warren's joint problems would improve if she became more compliant with taking the Plaquenil. But for the most part Warren's medical records indicate that she had numerous medical issues after the onset date despite being more consistent with taking her medication. Indeed, from August 2013 through December 2013, it appears that, in addition to appointments with her treating primary care physician and treating rheumatologist, Warren may have had appointments with up to twelve other physicians and/or nurse practitioners concerning issues she was having with her eyes, skin, ankle, balance (brain MRI) and chronic cough (chest x-ray).

The medical records reflecting these medical appointments for the most part indicate that Warren was taking the Plaquenil as prescribed. *See, e.g.,* AR 813-814, 635-639, 647-654.[10] Nothing in these medical records indicates that the doctors who

---

[9] Dr. Schmidt treated Warren for intermittent eye pain and vision difficulties such as blurred vision, as well as regularly screened Warren for vision problems that could arise from taking Plaquenil. In other words, Warren would have had to be seen by the ophthalmologist on a fairly regular basis even if it was unnecessary for her to seek treatment for eye pain caused by flare-ups of her lupus, because she still needed to be monitored for vision problems that could arise from her taking of Plaquenil.

[10] The ALJ attempts to discredit the comments in the medical notes about Warren's medication compliance by citing to Warren's pharmacy records, which the ALJ states show Warren had not filled her Plaquenil prescription on a regular basis despite reporting to her doctors that she had been taking it. *E.g.,* AR 38 ("Dr. Hsieh may have accepted as truthful several of claimant's reports that she had symptoms and [sic] spite of Plaquenil compliance when the pharmacy records contradict several of those reports."). But when Warren testified that she told Dr. Hsieh she was in fact trying to take the medicine as prescribed, the ALJ failed to question

Warren saw believed the appointments would not have been necessary had Warren

been more compliant with taking the Plaquenil.[11] In short, a fair reading of the

---

Warren regarding her supposed failure to re-fill her prescription on a regular basis. (AR 79-80). Without exploring that issue further and allowing Warren an opportunity to explain the discrepancy between her asserted medication compliance and her pharmacy records, the Court cannot say that the ALJ's suggestion about the inaccuracy of the medical record notations concerning medication compliance is supported by substantial evidence. *See Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014) (cautioning ALJs to make inquiries of the claimant about any perceived inconsistencies in the record); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (finding that an ALJ must not draw any inferences about the claimant's condition from his lack of medical care "unless the ALJ has explored the claimant's explanations as to the lack of medical care"); *Schickel v. Colvin*, 2015 WL 8481964, at *14 (N.D. Ill. Dec. 10, 2015) (holding that the ALJ's failure to ask the claimant about perceived inconsistencies "undermines his assessment").

[11] As an example, Dr. Tang's medical note written on November 4, 2013 notes a long list of Warren's "[a]ctive [p]roblem[s]," including discoid lupus, SLE, joint pain, hemangioma of liver, constipation, dyspepsia, recurrent major depression, overweight, and "encounter for longer (current) use of high-risk medication." (AR 767). Dr. Tang lists eight medications that Warren was then taking, including Plaquenil. (AR 767-768). Dr. Tang describes the complexity of Warren's medical issues as follows:

> For her SLE-related arthritis, she did not have sustained response after kenalog injection, and recently was started on MTX 1 month ago. Since then, she describes that she has been feeling extremely nauseous, has poor appetite, has problems sleeping, has had progressive issues with balance, and generally feels "discombobulated." Also has a new rash on her back. She also describes a cough for 3 months, dry, hacking cough, nighttime predominant. No new orthopnea, PND, leg swelling, no increase in SOB, although she is chronically fatigued.

> On further probing, she describes that the balance problem began prior to starting MTX.

> She is extremely frustrated with both her medical course and her inability to work and subsequent draining of her savings. Wants to know if she qualifies for disability.

medical notes disproves the notion that the primary cause of Warren's repeated need for medical care was her failure to follow prescribed medical treatment. As best the Court can tell, the ALJ's contrary conclusion is based on a few comments in the medical records appearing across a long period of time, which themselves do not fully discuss the situation regarding Warren's failure to regularly take the medicine and the relationship of that failure to Warren's medical condition, as well as perhaps on the ALJ's own super-imposed judgment on Warren's admitted past failures.

---

> She is scheduled to see her rheumatologist and dermatologist today.

AR 767. In response to Warren's reported symptoms, Dr. Tang states that she has no clear treatment plan for Warren's imbalance issues, that her plan for Warren's chronic cough was to send Warren for a chest x-ray, that Warren's major depression was "compounded by above medical problems" and that her plan in that regard was "to continue Paxil for now at current dose" because, "given multiple new issues and potential for medication side effects," she did "not want to increase the dosage at that time." *Id.* There are numerous medical notes in the record such as this, which do not place any blame on Warren for her medical problems based on a failure to take her medications regularly. Another example is a form completed by Warren's dermatologist dated December 11, 2012, which indicates without reference to medication noncompliance that Warren has extensive skin lesions "persisting for at least 3 months despite continuing treatment" which cover her "[t]otal head and fingers," that the skin lesions seriously interfere with her motion of the joints in two extremities and the palms of both hands, "seriously limiting patient[']s ability for fine and gross motor movements," and that Warren's "extensive skin lesions" "produce[ ] an inability to function outside a highly protective environment for a continuous period of at least 12 months." (AR 576). The ALJ ignored these medical notes/reports in favor of comments that mention Warren's failure to take the Plaquenil consistently, many of which pre-date her onset date. "Although the ALJ need not discuss every piece of evidence in the record, [s]he must confront the evidence that does not support h[er] conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

## B. THE ALJ'S REJECTION OF THE OPINION OF WARREN'S TREATING RHEUMATOLOGY SPECIALIST

The ALJ also rejected an opinion of Warren's treating rheumatologist, Dr. Hsieh, dated December 20, 2013. Dr. Hsieh completed a medical evaluation form for the State of Illinois, Department of Human Services, requesting information about Warren for purposes of determining Warren's eligibility for public assistance benefits or her employability status. (AR 816).[12] Dr. Hsieh indicated in the form that Warren's capacities in an eight-hour workday, five-days a week, to walk, bend, stand, stoop, sit, turn, climb, push, pull, speak, travel, fine manipulation, gross manipulation, finger dexterity, and ability to perform activities of daily living, were all reduced by more than fifty percent. (AR 820). Dr. Hsieh also indicated that Warren could lift no more than ten pounds at a time. *Id.* The ALJ did not assign any particular weight to Dr. Hsieh's opinion, but stated that it was not consistent with her treatment notes and other objective evidence of record. (AR 38). The only explanation given for that conclusion is that Dr. Hsieh "has consistently described the claimant's lupus as mild in her treatment records, and that she expected claimant's symptoms to be controlled with prescribed medication." (AR 38). Similarly, the ALJ states that Dr. Hsieh's findings on the preceding pages of the form are inconsistent with the functional limitations she notes on the last page,

---

[12] The ALJ notes in her decision that both Dr. Hsieh and Dr. Tang may have submitted their opinions "in connection with claimant's short and/or long-term private disability claims" (AR 39), but does not explain why this fact is a reason to disregard their opinions insofar as they may be relevant to the ALJ's determination of disability, even if, as the ALJ asserts, "the Commissioner uses different standards to assess disability than do such private insurers" (*id.*).

because she found only mild tenderness and reduced range of motion in Warren's wrists, with no synovitis, no ankle joint effusion, and no active scalp lesions. (*Id.*).

The ALJ's conclusion that Dr. Hsieh's functional limitations were inconsistent with her medical notes and other parts of the same form is not supported by a reasoned explanation. The ALJ based her finding of inconsistency in the form itself on the fact that Dr. Hsieh makes note of only mild abnormalities in Warren's muscular skeletal system. (AR 818). But the ALJ offered no explanation for why she believed Dr. Hsieh's opinion should be invalidated because more marked musculoskeletal findings were not present. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (ALJ should explain inconsistency). To the contrary, the ALJ's perfunctory dismissal of the opinion of Warren's long-time treating Northwestern rheumatology specialist based on the *ALJ's* perception that joint findings would be markedly profound if that opinion were accurate highlights the danger of the ALJ making a medical determination for which she is not qualified. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("[T]he ALJ's reliance on Moon's 'unremarkable' 2008 MRI as evidence that her migraines were not a significant problem is not supportable. No doctor ever suggested that the MRI evidence meant anything about Moon's migraines, and for good reason. Doctors use MRIs to rule out other possible causes of headache—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis.") (citing "Migraines: Tests and Diagnosis," Mayo Clinic, http://www.mayoclinic.org/diseases-

conditions/migraine-headache/basics/tests–diagnosis/con–20026358 (visited Aug. 13, 2014)).

Information available on the internet indicates that "[a]rthritis or synovitis (inflammation of the joint lining, called synovium) is common in Systemic Lupus Erythematosus (SLE)," with "up to 90% of patients" experiencing it at some point in time. Further, "[t]he pain is usually more severe than expected based on the appearance of the joint on examination. In fact, sometimes there is pain without swelling or even tenderness in the joint, in which case the symptom is called 'arthralgias' (literally meaning 'joint pain' in Greek)." *https://www.hss.edu/ conditions_joint-pain-lupus-really-arthritis.asp* (last visited on 1/3/2017). The Court is not attempting to inject its own factual findings into the matter but is only using this information to illustrate why it was inappropriate for the ALJ to reject Dr. Hsieh's medical opinion regarding Warren's functional limitations based on an unstated medical assumption the ALJ apparently was making without evidentiary support in the record to back it up. The possibility that an ALJ might "mistaken[ly] read[ ] [ ] the evidence illustrates why ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon*, 763 F.3d at 722 (citing *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) ("[T]he ALJ seems to have succumbed to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was in-consistent with a diagnosis of mental retardation because no expert offered evidence to that effect here."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th

Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")); *see also Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor. . . . Common sense can mislead; lay intuitions about medical phenomena are often wrong."). Without further explanation from Dr. Hsieh, the Court cannot discount the possibility that her assessment of Warren's physical limitations was based on the level of pain reported to her by Warren rather than on the level of swelling in Warren's joints.[13]

In addition, the ALJ should have conducted a further inquiry before concluding that Dr. Hsieh's previous references to Warren's lupus being "mild" were inconsistent with her functional capacity report. Warren suggests that Dr. Hsieh's use of the term "mild" was intended to mean only that her lupus-related symptoms were not life-threatening, and that, while her symptoms might not be life-threatening, that does not necessarily mean they were not disabling. *See* R. 12 at 8. At the very least, Warren is correct that the ALJ should not have ascribed a particular medical conclusion to Dr. Hsieh's use in the medical notes of the term

---

[13] Warren's pain may or may not be tied to the physical findings noted by the ALJ. *See Martin v. Sullivan*, 750 F. Supp. 964, 970 (S.D. Ind. 1990) (rejecting Appeal Council's finding that claimant's testimony regarding his symptoms was inconsistent with medical finding that claimant "had a full range of motion with no swelling, erythema, or increased warmth in the joint area" on the ground that "the ALJ's own medical advisor" stated that "lupus is a medical impairment that results from physical abnormalities reasonably expected to produce pain" and that "[l]upus patients may develop joint pains . . . that are not accompanied by inflammatory changes").

"mild" without seeking an explanation from Dr. Hsieh about what she meant by her use of that term and whether it was inconsistent with her functional assessment findings.[14]

In addition, the notations in the medical notes concerning Warren's lupus being "mild" represent only a "snapshot of [a] single moment," which is of "little value," according to the Seventh Circuit, in assessing a condition like lupus "that fluctuates over time." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Relying on those notations without also taking into consideration other medical evidence indicating that Warren's lupus was more serious than perhaps the word "mild" conveyed constitutes a "'sound-bite' approach to record evaluation," which the Seventh Circuit has deemed to be "an impermissible methodology for evaluating the evidence" in social security cases. *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014); *see also Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease . . . and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."); *Roth v. Colvin*, 2016 WL 890750, at *9 (N.D. Ill. Mar. 9, 2016) ("In reaching her conclusion, however, the ALJ committed the same error the Seventh Circuit has so frequently warned against: she focused solely on the reports of stability and ignored the many complaints of persisting symptoms."). Another example of the ALJ's "sound bite" approach to the

---

[14] *See* case citations in footnote 4, *supra*.

evidence is her citation (AR 41) to Dr. Tang's comment in a note from April 2013, which indicates that Dr. Tang suggested to Warren that she might want to consider returning to work "given that her medical conditions seem relatively stable" (AR 661). This note was written before Dr. Tang's medical notes from November 2013, previously discussed (*see* footnote 11), which describe Warren's worsening medical condition.[15]

That the ALJ took the sound-bite approach while ignoring the entire chronology of Warren's medical treatment as a whole is supported by the medical

---

[15] The ALJ's reference to Warren's ankle issue clearing up is even another example of the ALJ's cherry-picking of specific examination findings. While citing to the fact that the ankle problem had cleared up by the time Warren saw Dr. Hsieh in December 2013, the ALJ ignores the further discussion in the medical records which shows that the ankle pain had come on suddenly and that Warren had described the pain as "hurt[ing] all the time, throb[bing], worse if [the] ankle is touched, cannot put any pressure on the ankle, no known trauma or injury." (AR 781) (11/26/13 medical report). The medical notes further state that Warren also "has back and shoulder soreness/stiffness," and "had no problems with [her] ankle prior to this." *Id.* The medical notes conclude that "an ankle joint effusion is likely," and that "underlying synovitis would be highly suspect." (AR 782). In the latter medical note where Dr. Hsieh comments that the ankle pain/swelling "has since largely resolved on its own," she also notes that it was "acute in onset" and "severe" and that Warren "now has pain in her R shoulder blade, with radiation down her R arm," with "[s]trength . . . poor due to pain. Taking ibuprofen, which helps a bit. Feels her balance is better, with no recent falls, but does have some unsteadiness at times." (AR 799) (12/2/13 medical note). The notes also indicate that while Warren's treating physicians were uncertain about the causes of her symptoms, they did not seem to doubt Warren's reports of their nature and severity. *See, e.g.,* AR 800 (12/2/13 medical note) ("unclear if recent episodes of pain are related to her SLE. Of note, her SLE markers are repeatedly relatively normal"). Not only do these medical notes, when considered in their entirety, not support the ALJ's suggestion that the ankle problem was an insignificant issue, but they actually show the increasing complexity of Warren's medical condition, which overall appeared to be worsening with symptoms of a fairly severe nature and an unknown or uncertain etiology unpredictably appearing suddenly and then just as suddenly and unpredictably resolving on their own.

records when viewed in their entirety. Those records show that, from 2012 through about September 2013, Warren's overall condition began to decline. For instance, in March 2012, Warren told a medical resident that she had joint pain in her hands and wrist, along with headaches and throbbing in her eye, that she was applying medicine to her lesions daily and taking her Plaquenil, that she had a poor appetite but her weight was up, that she "was fatigued ALL of the time," that her "[m]ood is terrible" and that "she sometimes wants to poke someone's eyeballs out" because of how "frustrated [she was] by this disease that makes [her] feel sick all of the time." (AR 529). Dr. Tang noted about this same time that Warren's lupus seemed to be getting progressively worse, despite the fact that her lab work "did not reflect increased activity." (AR 527). Dr. Laumann also commented that "[t]his woman may need further systemic medication as she is feeling systemically miserable." (AR 528). Recall that, from sometime in the beginning of 2012 through May 2012, Warren was attempting to work part-time and was having difficulties doing that while at the same time taking her medications. In April 2012, Dr. Tang opined that Warren should not work full time (AR. 709), and in May 2012, Dr. Tang noted that Warren felt better since being let go at work (AR 516).

Despite stopping work, however, Warren continued to experience worsening symptoms. In July 2012, Dr. Dolan treated Warren for headaches, and also recommended wrist supports. (AR. 509). In August 2012, Warren had mild to moderate synovitis in the right finger joints with tenderness to palpation, and positive Tinel and Phalen's signs at the right wrist. (AR 30). Dr. Hsieh gave her an

injection for pain (AR 503), and again noted optimistically that if she took her Plaquenil regularly, her symptoms should improve and the frequency of future flare ups of her SLE should decrease (AR 490). Warren continued with her treatment throughout the beginning part of 2013, seemed to be doing better for a time, and, in April 2013, Dr. Tang suggested that she might want to consider returning to work (AR 661).

About three months later, however, on July 1, 2013, Dr. Tang noted that Warren was "express[ing] frustration" that "she does not feel any better" despite "being adherent with medications for lupus and depression." (AR 638; *see also* AR 639 (SLE "more active lately with increase arthralgias in hands")). In September 2013, Dr. Hsieh again notes that Warren's lupus was "mild," although Warren was experiencing a flare up of symptoms. She gave Warren another injection, and in October 2013, Warren started taking methotrexate, considered a "high risk" medication.[16] In November 2013, Dr. Tang ordered a brain MRI to assess balance problems. (AR. 768). Also in November 2013, Warren was treated for left ankle pain, with x-rays showing effusion and likely underlying synovitis. (AR 781-82, 833). In December 2013, Dr. Laumann recommended increasing the dosage of Warren's methotrexate given her recurrent swollen, tender, and painful joints. (AR 792). Also in December 2013, Dr. Tang treated Warren for right shoulder pain, noting her depression compounded pain management. (AR 799-801). On December

---

[16] *See https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682019.html* (last visited 1/3/2017). (methotrexate "may cause very serious, life-threatening side effects. You should only take methotrexate to treat cancer or certain other conditions that are very severe and that cannot be treated with other medications.").

20, 2013, Dr. Hsieh summed up Warren's treatment for these varied medical issues over the past few months, yet she again referred to Warren's SLE as being "mild." (AR 808). At the same time, she prepared a functional assessment report noting a fifty percent reduction in capacity. She also indicated that she anticipated that Warren's disability would be short-term. (AR 813-814 (noting that "disability should be temporary once her medications are optimized and her joint pain is under control")).

This medical record, when viewed as a whole, does not so much show an inconsistency between Dr. Hsieh's functional assessment and her medical notes as it does an ambiguity over Dr. Hsieh's continued optimistic belief that she would be able to control Warren's lupus symptoms with medication, Thus, in rejecting Dr. Hsieh's functional assessment report on the conclusory basis that it was inconsistent with her previous medical notes, the ALJ failed to address the real issue here, which is whether Warren's lupus symptoms are able to be, or have been, controlled to the degree and level of certainty and on-going stability that Dr. Hsieh seemed to be predicting, in which case it would be reasonable to conclude that Dr. Hsieh's functional assessment in December 2013 was indeed only a temporary and short-term analysis of Warren's abilities at that time. To justify a finding against Warren on that issue, the ALJ should have sought clarification from Dr. Hsieh concerning the basis for the functional limitations she reported in December 2013, how long she expected Warren's limitations to last, the progress and prognosis for Warren's treatment, and the degree of certainty she had regarding her prediction

that ultimately Warren's symptoms would be under control. By not discussing Warren's worsening medical condition in the six months prior to the hearing and by not seeking further insight into Dr. Hsieh's views regarding that situation, the ALJ failed to "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion" that Dr. Hsieh's functional capacity report was not entitled to any significant degree of weight in the ALJ's assessment of Warren's residual functional capacity. *Beardsley*, 758 F.3d at 837.

### C. THE ALJ'S FAILURE TO SUPPORT HER RFC AND CREDIBILITY FINDINGS

Even if the ALJ's rejection of the opinions of Dr. Tang and Dr. Hsieh were upheld under this Court's substantial evidence review, that would not save the ALJ's ultimate finding that Warren was not disabled. At the end of the day, the "gaping hole in the record," *Allensworth*, 814 F.3d at 835, "is the absence of any evidence" to support the ALJ's RFC finding that Warren can "lift and/or carry up to twenty pound occasionally and up to ten pounds frequently," can "sit, stand and/or walk throughout a normal workday, with typical breaks," and can "occasionally climb ramps or stairs, stoop, kneel, or crouch." (AR 41). "Although the [ALJ] concluded that [Warren] can perform light work for 40 hours a week, she did not indicate what evidence supported that conclusion—a fatal error." *Allensworth*, 814 F.3d at 835 (citing *Briscoe*, 425 F.3d at 352 (The ALJ's failure to properly explain how he arrived at a residual functional capacity determination "is sufficient to warrant reversal of the ALJ's decision."); *accord Eakin v. Astrue*, 432 Fed. App'x 607, 611 (7th Cir. June 30, 2011) ("The RFC determination should include a

discussion describing how the evidence, both objective and subjective, supports the ultimate conclusion. Social Security Ruling 96–8p instructs ALJ's to assess a claimant's work-related abilities on a function-by-function basis, and although the ALJ need not discuss every piece of evidence, she must still articulate, at some minimum level, her analysis of the evidence.") (internal quotation marks and citations omitted).

By rejecting Dr. Hsieh's functional capacity assessment, the ALJ created an evidentiary deficit. *See Suide v. Astrue*, 371 Fed. App'x 684, 690 (7th Cir. 2010) ("Even assuming that Dr. Orris's opinions did not deserve greater weight, it is the evidentiary deficit left by the ALJ's rejection of his reports—not the decision itself— that is troubling."). The ALJ did not obtain evidence to fill this void. In particular, the ALJ did not explain how she determined that Warren could perform the lifting and carrying requirements of light work despite her lupus symptoms. The only medical evidence in the record, other than the treating physicians' opinions that the ALJ rejected, was the pre-onset date opinions of the consulting physicians, to whom the ALJ accorded "some weight." (AR 39). But the ALJ did not explain the evidentiary basis for her conclusion that the consulting examining physician's RFC opinion that, as of February 17, 2012, Warren could perform work at a medium exertional level could simply be adjusted downward without any further physical examination of Warren to provide support for the ALJ's conclusion that, as of the date of her decision on May 30, 2014, Warren was capable of performing "a wide range of light work" (AR 39). *See Strong v. Barnhart*, 2002 WL 31415714, at *7

(N.D. Ill. Oct. 23, 2002) ("We agree with plaintiff that her RFC before the onset date is unimportant and irrelevant to whether she was disabled after that date. Thus, the ALJ's reliance on this assessment is misplaced. When we eliminate the assessment by the state medical examiners, we are left without evidence that would support the ALJ's conclusion that Strong was limited to perform all aspects of medium work."); *see also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (ALJ erred in evaluating "new, and potentially decisive" medical evidence that came into the record after the consulting physicians' opinions to determine claimant's functional limitations rather than seeking expert medical opinion where the new evidence could "reasonably change" the previous functional opinion); *Harlin v. Astrue*, 424 Fed. App'x 564, 568 (7th Cir. 2011) ("To the extent that the ALJ projected how Dr. Rozenfeld's would have testified had she seen the additional documents, the ALJ improperly assumed the role of doctor."). Indeed, there is no evidence in the consulting examiner's report that he "even tested [Warren's] ability to lift heavy objects, so the ALJ could not legitimately have relied on that examination to conclude that [Warren] can occasionally lift 20 pounds." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). The medical evidence regarding Warren's mild abnormalities in her muscular skeletal system also does not support the ALJ's RFC findings. This evidence at most means that Warren "could lift and carry things: but what things [s]he could lift, how large, how heavy, for how long—none of this was explored." *Garcia*, 741 F.3d at 762. While it is true that Warren "bears the burden of producing evidence of her impairments, . . . she did produce evidence in

the form of her own testimony as well as [the functional assessment report of Dr. Hsieh]. If the ALJ found this evidence insufficient, it was her responsibility to recognize the need for additional medical evaluations." *Scott*, 647 F.3d at 741.

There are a number of other conclusions the ALJ reached in making her RFC assessment that also are not supported by substantial evidence, such as the ALJ's failure to support her conclusion that Warren's fatigue would preclude only a small portion of jobs in the light work category (AR 41), as well as her conclusion that Warren's well documented treatment for depression did not limit her capacity for light work in any meaningful way. The Court will not go into each of these issues in any detail other than to note that it substantially agrees with Warren's assessment of the ALJ's treatment of them. *See* R. 12 at 11-13; R. 18 at 9-11. In addition, the Court substantially agrees with Warren's arguments regarding errors in the ALJ's credibility determination, *see* R. 12 at 14-16; R. 18 at 11-12, and specifically rejects the ALJ's findings (1) that Warren had "significant gaps in treatment, [which] are not explained by her reports of difficulty obtaining medical insurance or paying for it," (2) that she "could not explain credibly her failure to continue and [sic] mental health treatment with Dr. Dinwiddie during 2012," (3) that she "exaggerate[d] somewhat the diagnostic evidence in the record" such as the findings of her brain MRI, (4) that she "minimized her alcohol use," and (5) that she "misrepresented the events of January 22, 2014, stating that Northwestern refused to admit her." (AR 40). The Court's review of the record reveals that none of these findings regarding Warren's credibility are substantially supported by the evidence.

## CONCLUSION

The ALJ's improper assessment of the medical opinions of Warren's treating physicians, her failure to adequately support her RFC determination, and her unsubstantiated credibility determinations require the Court to vacate the Commissioner's final decision denying Warren's application for social security disability benefits. Accordingly, the Commissioner's motion for summary judgment, R. 16, is denied, the ALJ's decision is vacated, and the case is remanded to the Social Security Administration for further proceedings consistent with this decision.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: January 4, 2017